IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


JEFFREY BACON, STEVE HEBB,

NORM HAYGOOD, DENNIS WILSON,

DEREK KYRO, AMRO SAADELDIN,

TIMOTHY BAYNES and MICHELLE DIXON,

Each Individually and on Behalf

of Others Similarly Situated,

                    Plaintiffs,

           vs.              Case No. 4:11-CV-14103

                            Hon. Gershwin A. Drain

EATON AEROQUIP, LLC,

                    Defendant.

_____


        The Deposition of JEFFREY P. BACON,

        Taken at 2595 Bob McClain Drive NW, Airport Road,

        Jackson, Michigan,

        Commencing at 8:50 a.m.,

        Friday, November 9, 2012,

        Before Kathryn L. Janes, CSR-3442, RMR, RPR.

Page 234

1  Q.  You can go ahead and answer.
2  A.  Well, for the FLSA claim?
3  Q.  Yes.
4  A.  Whatever the -- if Eaton wrongfully classified us,
5      probably for three years back overtime. Because it
6      was probably intentional. I believe it was
7      intentional.
8  Q.  Do you have any personal knowledge that they
9      intentionally -- well, strike that.
10          Do you have any personal knowledge that any
11     government entity or any legal opinion was issued to
12     Eaton Aeroquip deeming your classification to be
13     nonexempt?
14 A.  No.
15 Q.  Approximately how much do you think you are owed for
16     the overtime that you claimed that you worked?
17 A.  I have no idea. Whatever hours I worked, whatever
18     best estimate can be come up with, and whatever the
19     regulations state or whatever the law states.
20 Q.  Do you have any sense of the amount?
21 A.  I worked a lot of overtime. We were on mandatory
22     overtime for the entire -- almost the entire period of
23     time that's in question here, and I worked a lot of
24     weekends. I stayed late a lot, came in early a lot
25     and I worked from home a lot. So I mean, it's a

Page 235

1      significant amount of hours. I worked more hours than
2      my employees did.
3  Q.  Did you ever look for alternative work while you were
4      employed by Eaton Aeroquip?
5  A.  Yeah, I did.
6  Q.  Did you ever interview with any other organization
7      while you were employed by Eaton Aeroquip?
8  A.  Yeah.
9  Q.  Who did you interview with?
10 A.  Padnos Steel in Lansing, but that was before this
11     lawsuit. I mean, the dates, that was in, I don't
12     know, 2007 maybe. Right next door to the best Italian
13     restaurant in Lansing.
14 Q.  And do you know why you did not get that job?
15 A.  I did get offered that job.
16 Q.  And what was the job?
17 A.  Supervisor.
18 Q.  For?
19 A.  For Padnos.
20 Q.  What do they do?
21 A.  It's a metal processing firm, one of the biggest ones
22     in the area. They buy and sell and process scrap
23     metal of all different kinds. It's a family owned
24     business. It's been there for years.
25 Q.  Okay. And why didn't you take the job?

Page 236

1  A.  I did like Eaton, even though I'm from -- at the time
2      I lived in Lansing and Padnos was five minutes from my
3      mom's house, and it was ten minutes from my house.
4      But I did like Eaton, I liked my manager, and I
5      liked -- would have liked -- at the plant at that time
6      things were not quite as intense at the plant. This
7      was in -- and I want to say 2007. I decided to stay
8      with Eaton.
9  Q.  Okay. Did you look for employment after 2007?
10 A.  No. Not that I recall.
11 Q.  So you were working a lot of overtime, but you did not
12     look for alternative employment?
13 A.  Did I say I hate working all this overtime, I need to
14     find another job, is that what you're saying?
15 Q.  Yes.
16 A.  I said I probably should find another job, but, you
17     know, I mean, you're at the company, you're focused on
18     your job, you know, you're hoping that things get
19     better. You're hoping that the hours go down, that
20     the pressure is relieved. Probably had -- had I
21     stayed with Eaton, had I not been terminated and had
22     things continued the same way they had, you know, with
23     all the hours and such, I probably would have
24     eventually reached the point that you're talking
25     about, but I hadn't reached it yet.

Page 237

1  Q.  How much would you have had to make per year on a
2      salary basis to feel you were fairly compensated?
3          MR. SANFORD: Object to the form.
4  A.  Well, I mean, in the context of when I first started
5      at Eaton, and we were working 43 hours a week, right?
6      I was totally happy. It -- if you told me that it was
7      a 60 hour, 65-hour a week job, would I have been
8      happy? No, I would say you're going to have to bump
9      it up. I don't know what I would have decided that
10     number to be. But you could sit there and figure it
11     out on your calculator on a piece of paper what your
12     hourly wage was after working those hours and you
13     could determine yourself. But I mean, I was happy
14     with my salary if my hours were reasonable. I think
15     most people would agree with that.
16 BY MS. BOXER:
17 Q.  Okay. If you worked on average 50 hours per week, if
18     you were paid $60,000 a year, would that seem
19     reasonable?
20 A.  I don't know. You'd have to compare it to what your
21     reports are making working the same hours, things like
22     that, I guess, to be reasonable.
23 Q.  Okay. If you were, as you said, 60 hours a week, if
24     that's what you were working, if you made $80,000 a
25     year, do you think that would seem sufficient?

Rennillo Deposition & Discovery
(216) 523-1313          A Veritext Company          (888) 391-3376

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


JEFFREY BACON, STEVE HEBB,

NORM HAYGOOD, DENNIS WILSON,

DEREK KYRO, AMRO SAADELDIN,

TIMOTHY BAYNES and MICHELLE DIXON,

Each Individually and on Behalf

of Others Similarly Situated,

             Plaintiffs,

      vs.           Case No. 4:11-CV-14103

                   Hon. Gershwin A. Drain

EATON AEROQUIP, LLC,

             Defendant.

_____


The Deposition of TIMOTHY PAUL BAYNES,

Taken at 2595 Bob McClain Drive NW, Airport Road,

Jackson, Michigan,

Commencing at 9:12 a.m.,

Wednesday, November 7, 2012,

Before Kathryn L. Janes, CSR-3442, RMR, RPR.

Page 70

1    they started about two years ago, and it basically
2    would have what your daily goal was and your weekly
3    goal, and we would track the productivity hour by hour
4    on that board.  This was basically only done for my
5    Rynglok area, not specialty coupling because it was so
6    diverse, you couldn't really just track what they did.
7    In the end we tried to, but they realized there were
8    too many variables with the information.
9    Q.  Now, you were responsible for tracking this
10    information for the employees that you supervised?
11    A.  Yes.
12    Q.  And did you do anything to make sure that your
13    employees met those daily and weekly goals?
14    A.  It was my job to make sure that we had the adequate
15    staffing, that we were working on the right things at
16    the right time, and that we could honestly achieve
17    that goal.
18    Q.  And you consider that part of your responsibility?
19    A.  Yes.  It was, to be honest, it was what we were told
20    we were to do.
21    Q.  Did you have any responsibilities for keeping track of
22    supplies in your area?
23    A.  No.  That was done by the mechanical engineers and the
24    employees.
25    Q.  You had no role in tracking supplies in your area?

Page 71

1    A.  Other than printing off the inventory form, that was
2    it.
3    Q.  You had just said that you went around the area to
4    make sure everyone had what they needed, is that not
5    supplies?
6    A.  As far as supplies that would -- yeah, yeah.
7    Q.  Okay.  So you were responsible for keeping track of
8    supplies?
9    A.  Yes.
10    MR. SANFORD:  Object to the form.
11    A.  To a certain extent, yes.
12    BY MS. BOXER:
13    Q.  Did you have any responsibilities in keeping track of
14    scrap costs?
15    A.  No, that was done by the mechanical engineers.
16    Q.  Did you have any responsibility to report any
17    information to the mechanical engineers about scrap
18    costs?
19    MR. SANFORD:  Object to form.
20    A.  No, I did not.
21    BY MS. BOXER:
22    Q.  Did you ever do any of the assembly or manufacturing
23    work yourself?
24    A.  No, I did not.
25    Q.  Why not?

Page 72

1    A.  Per the collective bargaining agreement, I cannot do
2    that, they did have in the bargaining agreement called
3    an engineering clause that could be used in certain
4    instances for -- and some supervisors, I never did,
5    they would exercise that clause to use it, if it was a
6    special product or something.  But other than that per
7    the CBA, I was not allowed to do any assembly work at
8    all.
9    Q.  And what was the engineering exception?
10    A.  It's -- I don't want to really speculate on it, it's
11    just a clause that would allow them to come on the
12    floor and actually work in the area with the employees
13    to build the product.
14    Q.  Now, you've mentioned the CBA a number of times at the
15    Jackson plant, are you familiar with the Jackson plant
16    CBA?
17    MR. SANFORD:  Object to form.
18    A.  Somewhat, but not completely.
19    BY MS. BOXER:
20    Q.  Did you have a copy of it?
21    A.  Yes, I did.
22    Q.  And who provided you the copy of the CBA?
23    A.  Human resources.
24    Q.  And when did they provide that to you?
25    A.  I could not tell you.  I could only say it was after

Page 73

1    they got the copies in and then issued them for all
2    the employees to have, we probably got ours at the
3    same time.
4    Q.  Did you consider the CBA binding on your actions as a
5    production supervisor of Jackson plant?
6    A.  Yes, I did.
7    Q.  Do you recall what the CBA governed?
8    A.  Not everything, but some of the things.
9    Q.  Can you identify what it governed?
10    A.  It governed the overtime, it governed the transfer and
11    movement of employees, it governed how qualifications
12    would be met, it governed -- it governed how they
13    could retrieve certain rights, bid rights, and it
14    also, it included the general plant rules for the
15    entire plant as well.
16    Q.  Did it also govern discipline and termination?
17    A.  Yes, it did.
18    Q.  Did you abide by the terms of the collective
19    bargaining agreement?
20    A.  At all times.
21    Q.  Do you feel that people at the Jackson plant -- well,
22    let me back up.
23    Do you feel that upper management carried
24    out the terms of the collective bargaining agreement
25    at the Jackson plant?

19 (Pages 70 to 73)

Rennillo Deposition & Discovery
A Veritext Company
(216) 523-1313                                          (888) 391-3376

Page 162

1  A.  Yes, I did.
2  Q.  Okay.  Can you please read that e-mail?
3  A.  Yes.  It says:  Sarah, in order to avoid a grievance
4     regarding OT, I would like you to pay Ray Valdez the
5     OT rate for an N9 for a total of four hours, in
6     parentheses, Tuesday, 8-17 and Wednesday, 8-18.  We
7     made an error in not honoring seniority because of a
8     miscommunication, parentheses, hourly and salary.  It
9     was thought because standard coupling is tasked and
10    specialty coupling is not, that we did not have to
11    honor seniority when it came to employees seeking a
12    replacement to work their OT hours at the beginning of
13    the shift 5:00 a.m. to 7:00.  Because all specialty
14    coupling is one classification, seniority has to be
15    honored and it was not.  Paula Langston was asked by
16    Janie Sherwood to take her place from 5:00 a.m. to
17    7:00, parentheses, Tuesday and Wednesday, and Janie
18    should have asked Ray Valdez who is the highest
19    seniority in specialty coupling.  So this is why I am
20    authorizing you to pay Ray for those four hours.  This
21    will stop our being grieved for this situation.  Any
22    questions or concerns, feel free to reply and thank
23    you for the assistance, Timothy.
24 Q.  Did anyone direct you to prepare this e-mail?
25 A.  No, I prepared this e-mail on my own.

Page 163

1  Q.  Do you know if Ray was, in fact, paid?
2  A.  From the best of my remembrance, I believe he was
3     paid.
4  Q.  We're near the finish line, at least mine.  Apparently
5     your counsel is also going to depose you.
6        Do you want to take a break?
7  A.  Oh, no, I'm fine.
8  Q.  Are you aware that Mr. Bacon and other plaintiffs
9     contacted the U.S. Department of Labor about his claim
10    that Eaton Aeroquip improperly classified supervisors
11    at the Jackson plant?
12 A.  Yes, I am.
13 Q.  Did you sign the letter that was sent to the U.S.
14    Department of Labor?
15 A.  I believe I did.
16 Q.  And how did you learn about the letter?
17 A.  In conversations with Jeff.
18 Q.  Did you have many conversations with Jeff about this
19    issue?
20 A.  No.
21 Q.  Did you prepare the letter?
22 A.  No, I did not.
23 Q.  Who prepared the letter?
24 A.  I believe the letter was prepared by Jeff.
25 Q.  Are you aware that the U.S. Department of Labor

Page 164

1     decided to take no action in response to Mr. Bacon's
2     letter?
3        MR. SANFORD:  Object to the form.
4  A.  No, I did not know.
5  BY MS. BOXER:
6  Q.  Are you aware that the U.S. Department of Labor wrote
7     a letter to Mr. Bacon informing him that the
8     department would not take any action on Mr. Bacon's
9     overtime complaint?
10       MR. SANFORD:  Objection to form.
11 A.  No, I did not know.
12 BY MS. BOXER:
13 Q.  Have you ever seen that letter?
14 A.  No, I have not.
15 Q.  Do you have any knowledge of any ruling or decision
16    from a government agency regarding classification of
17    production supervisors at the Jackson plant as exempt?
18 A.  No.
19 Q.  Do you have any knowledge as to how Eaton Aeroquip or
20    management at the Jackson plant made the decision to
21    classify production supervisors as exempt?
22 A.  No.
23 Q.  Do you have any personal knowledge as to what Eaton
24    Aeroquip or Jackson plant management did in response
25    to complaints about the classification of production

Page 165

1     supervisors?
2  A.  No.
3  Q.  Have you read any of the Complaints that were filed in
4     this lawsuit?
5  A.  I believe I may have read one.
6  Q.  Were you involved in drafting any of the Complaints?
7  A.  No.
8  Q.  Did you discuss what was contained in any of the
9     Complaints with your lawyer before it was filed, and
10    I'm not asking for what you discussed, I'm just asking
11    whether you did, in fact, discuss it prior to its
12    being filed?
13       MR. SANFORD:  I'm going to object to the
14    form.
15 A.  Did we discuss the Complaint?
16 BY MS. BOXER:
17 Q.  Correct.  Before it was filed?
18 A.  Yes.
19 Q.  Is there anything that you believe is inaccurate in
20    the Complaint?
21 A.  No.
22 Q.  Have you in preparation for today, did you take any
23    action?
24 A.  No.
25 Q.  Did you review any documents in preparation for

42  (Pages 162 to 165)

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


JEFFREY BACON, STEVE HEBB,

NORM HAYGOOD, DENNIS WILSON,

DEREK KYRO, AMRO SAADELDIN,

TIMOTHY BAYNES and MICHELLE DIXON,

Each Individually and on Behalf

of Others Similarly Situated,

               Plaintiffs,

       vs.             Case No. 4:11-CV-14103

                      Hon. Gershwin A. Drain

EATON AEROQUIP, LLC,

               Defendant.


_____


The Deposition of MICHELLE MARIE DIXON,

Taken at 2595 Bob McClain Drive NW, Airport Road,

Jackson, Michigan,

Commencing at 9:27 a.m.,

Thursday, November 29, 2012,

Before Kathryn L. Janes, CSR-3442, RMR, RPR.

Page 110

1  Q.  So you earned $75,961 in 2010?
2  A.  Yes, that's what I earned total.
3  Q.  Are you claiming overtime for 2010?
4  A.  No.
5  Q.  No?
6  A.  No.
7  Q.  You believe that you were properly classified as
8      exempt in 2010?
9  A.  Yes.  There was a period of time I was moved back to
10     supervisor for a month and a half.
11 Q.  In 2010?
12 A.  Or 2011, I'm not sure.  It was in my interrogatory.
13 Q.  Could it have been 2012?
14 A.  I don't think so.
15 Q.  Okay.  So you're not claiming any lost -- or any
16     additional wages for 2010?
17 A.  I don't believe so.
18 Q.  Are you claiming any additional wages for 2009?
19 A.  Yes, I was supervisor at that time.
20 Q.  Approximately how many hours do you believe that you
21     worked in 2009?
22     MR. SANFORD:  I object to form.
23 A.  I have it figured out somewhere.  I don't have it with
24     me.  I did a calculation based on approximate hours
25     per week minus the MULAs and vacation time and came up

Page 111

1      with a number.
2  BY MS. BOXER:
3  Q.  Okay.  Can you provide that number?
4  A.  I can't right off the top of my head, but I can get it
5      for you.
6  Q.  Okay.  If you could provide that number to your
7      counsel and calculations that you did and provide it
8      to us?
9  A.  Okay.
10     MR. SANFORD:  Counsel has on his calendar a
11     deadline to get everyone's calculations to you by, I
12     believe it is Tuesday, the 4th.  Yes, a self-imposed
13     better get this done deadline.
14     MS. BOXER:  Okay.
15     (Whereupon Ms. Jansen left the
16         room at 2:15.)
17 BY MS. BOXER:
18 Q.  Do you recall what that amount was?
19 A.  The amount of what was?
20 Q.  Overtime that you calculated?
21 A.  No.
22 Q.  Was it five hours per week?
23 A.  No, it was based off of 10 hours a week.
24 Q.  Okay.  So 10 hours a week for 48 weeks?
25 A.  Whatever it was, you know, minus the vacation and the

Page 112

1      MULAs.
2  Q.  Do you know how many years you looked back from the
3      date that you filed a lawsuit --
4      MR. SANFORD:  Object to the form.  Sorry.
5  BY MS. BOXER:
6  Q.  -- for purposes of recovering overtime?
7      MR. SANFORD:  Object to form.
8  A.  I think I remember hearing something about three
9      years.
10 BY MS. BOXER:
11 Q.  Well, it's generally two years and three years for
12     what they call willful violation.
13 A.  Okay.
14 Q.  Which means that if there's -- well, it's an issue of
15     law.
16 A.  Okay.
17 Q.  So if we look back two years, you wouldn't -- it
18     doesn't appear that you'd fall into the class, but if
19     you look back three years -- it's not a class, but if
20     you look back three years, the 2009 may be included,
21     depends on maybe a month or two.
22 A.  If it's found not willful.
23 Q.  Hum?
24 A.  I said if it's found not willful, if that's what the
25     law is, I'm not speculating on the law.

Page 113

1  Q.  So and your Complaint was filed in this case on or
2      about November 1st of 2012?
3  A.  I actually filed the paperwork in July, but whatever
4      it took to get through the loopholes, I'm guessing.
5  Q.  And Exhibit A3, your 2011 W-2, was that your salary in
6      2011, $75,296?
7  A.  With any bonus and everything, it must have been
8      close, yeah.
9  Q.  It must have been what?
10 A.  It must have been close, I'm assuming, yep, with --
11     that must be it.
12 Q.  Do you recall what salary band you were in for 2011?
13 A.  I don't know which year I moved to salary band 8.  I
14     was a 7 and I was moved to salary band 8.  I don't
15     know if it was the end of 2011 or the beginning of
16     2012.
17 Q.  And approximately how much did you make?  What was
18     your salary in 2012 under salary band 8?
19 A.  Right before I left, I was moved up to $81,600, I
20     believe it was.
21 Q.  Back to 2011, you were in salary band 7?
22 A.  Correct.
23 Q.  You said that you were a production supervisor or that
24     you filled in for a month or month and a half?
25 A.  I did.

29 (Pages 110 to 113)

Page 306

```
1   BY MS. BOXER:
2   Q.  So you've never seen the letter?
3   A.  No.
4   Q.  Do you have any knowledge of any ruling or decision
5       from the government agency regarding classification of
6       production supervisors at the Jackson plant?
7   A.  I'm sorry, repeat that.
8   Q.  Do you have any knowledge of any ruling or decision
9       from any government agency like the Department of
10      Labor regarding the classification of production or
11      any other supervisors at the Jackson plant?
12  A.  No.
13  Q.  So no one ever told you that there was an opinion or a
14      ruling about the production supervisors or the
15      logistics supervisors at the Jackson plant?
16  A.  That there was an opinion about it?
17  Q.  Yeah, like an opinion issued by a government entity
18      that they were properly classified as exempt or not
19      properly classified as exempt?
20  A.  No.
21  Q.  Do you have any personal knowledge of how your
22      classification as a production supervisor was
23      determined at the Jackson plant?
24  A.  No.
25  Q.  Do you have any personal knowledge of how your
```

Page 307

```
1       classification was determined by Eaton Aeroquip?
2   A.  No.
3   Q.  Do you have any personal knowledge of what was done by
4       management or HR at the Jackson plant to review the
5       classification of production supervisors?
6   A.  I don't know if they did anything when we brought it
7       to their attention.
8   Q.  Do you have any knowledge of what management of the
9       Jackson plant did to review the classification once
10      Bacon and others complained about the classification?
11  A.  No.
12  Q.  Do you have any personal knowledge of what Eaton
13      Aeroquip or Eaton did to determine or review the
14      classification of production supervisors at the
15      Jackson plant?
16  A.  No.
17  Q.  Have you read any of the complaints in this lawsuit?
18  A.  Yes.
19  Q.  Were you involved in drafting any of the complaints?
20  A.  No.
21  Q.  In preparation for your deposition today, did you look
22      at any documents?
23  A.  We had some samples of some of the discovery, I think
24      discovery documents is what you would call them.
25  Q.  Did you look at any of the documents that contained
```

Page 308

```
1       your name?
2   A.  There may have been one with my name on it, I don't
3       recall specifically.
4   Q.  When did you decide to join the lawsuit?
5   A.  I believe it was in July.
6   Q.  Of this year?
7   A.  Uh-huh.
8           MR. SANFORD:  You have to say --
9       A.  Yes.  Sorry.  Yes, July 2012.
10  BY MS. BOXER:
11  Q.  How did you come to make that decision?
12  A.  Frustrated with the influence the union held at the
13      facility and wanted to support Jeff.
14  Q.  Why did you want to support Jeff?
15  A.  Because he was right.
16  Q.  Right about what?
17  A.  That we don't meet all the requirements to be exempt
18      employees, supervisors.
19  Q.  Have you reviewed the regulations?
20  A.  We did.
21  Q.  Who's we?
22  A.  We met with attorneys, we --
23  Q.  I don't want to hear about what you talked about with
24      attorneys.
25  A.  Okay.
```

Page 309

```
1   Q.  How did you come to hire your attorney?
2   A.  Jeff hired him.
3   Q.  Okay.  And do you know why he hired an attorney from
4       Arkansas?
5   A.  Because he wanted a good attorney.
6   Q.  That was good.
7   A.  Thank you.
8           MR. SANFORD:  Here's a dollar, just
9       kidding.
10  BY MS. BOXER:
11  Q.  Did you contact -- do you know if Jeff or anyone else
12      contacted an attorney in Michigan?
13  A.  I do not know what they did.
14  Q.  Have you ever talked to any Michigan lawyer about the
15      issues in this lawsuit?
16  A.  I met with an attorney.
17  Q.  You met with an attorney in Michigan?
18  A.  I did.
19  Q.  And when did you meet with an attorney in Michigan?
20  A.  When I was being retaliated against and the last
21      chance agreement came out.
22  Q.  So you had an attorney review the last chance
23      agreement?
24  A.  Yes.
25  Q.  When you -- have you met with an attorney since that
```

78  (Pages 306 to 309)

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


JEFFREY BACON, STEVE HEBB,

NORM HAYGOOD, DENNIS WILSON,

DEREK KYRO, AMRO SAADELDIN,

TIMOTHY BAYNES and MICHELLE DIXON,

Each Individually and on Behalf

of Others Similarly Situated,

               Plaintiffs,

       vs.           Case No. 4:11-CV-14103

                 Hon. Gershwin A. Drain

EATON AEROQUIP, LLC,

               Defendant.

_____


      The Deposition of NORMAN MELROY HAYGOOD, III,

      Taken at 2595 Bob McClain Drive NW, Airport Road,

      Jackson, Michigan,

      Commencing at 9:13 a.m.,

      Thursday, November 8, 2012,

      Before Kathryn L. Janes, CSR-3442, RMR, RPR.

Page 54

1  A.  Well, it says here walking on ice covered surfaces.  I
2      don't remember the exact words I read to them.  I can
3      tell you it was something due to the effect of having
4      employees be careful when they walk out to their cars
5      in the wintertime.
6  Q.  Do you recall giving this training?
7  A.  I don't recall it.  I see my name and signature and
8      the date.
9  Q.  Do you have any reason to believe that on January 5th,
10     2011, you did not give this training?
11  A.  I have no reason to believe I did not.
12  Q.  It's noted on each page in your handwriting is also 30
13     minutes; is that correct?
14  A.  That's correct.
15  Q.  Is that about how long the training took?
16  A.  This would have been one form of it.  I tried to cover
17     other topics, but the MESH minute was the first topic
18     to be covered.
19  Q.  For every weekly meeting that you had, would there
20     have been a sign-in sheet like Haygood Exhibit A3?
21  A.  Correct.
22  Q.  This is a -- it's a five-page document, all with
23     different names on it, is there any organization to
24     the way the names are distributed that you can
25     determine from Haygood Exhibit A3?

Page 55

1  A.  There's no particular organization.  I can only
2      speculate.  This has been over a period of time to
3      where I may have taken one multiple blank sheets,
4      passed them around the room and I may have been
5      covering a supervisor that wasn't here that night
6      because there's more names on here than people that
7      work for me.
8  Q.  I see.  So that was my next question.  So on this
9     list, you see people that you supervised?
10  A.  Correct.
11  Q.  And there are also others?
12  A.  That's correct.
13  Q.  Okay.  You can put Haygood Exhibit A3 to the side.
14     Oh, see, this is the Columbo moment.  Actually, I'm
15     not done with A3.  Were you required to turn these
16     training sign-in sheets represented by Haygood Exhibit
17     A3 in to anyone at the company?
18  A.  Yes, I was.
19  Q.  Who did you have to give them to?
20  A.  It would have been, I believe, Randy Gamble was the
21     health and safety, and I also kept a record for my
22     own, my own record of these.
23  Q.  So every time you would have a training session, one
24     of these training sign-in sheets would be created or
25     multiple sign-in sheets would be created; is that

Page 56

1     correct?
2  A.  The sign-in sheet is a standardized document that the
3      company has.  And as the employees sign them, I
4      photocopy, keep my own record of it, and turn in the
5      original to Randy Gamble.
6  Q.  And that's something you did in the regular course of
7     holding these MESH minute meetings?
8  A.  Correct.
9  Q.  Okay.  Now you can put A3 aside.
10         MR. FIORELLA:  I think we're at the point
11     where I'm going to be starting another topic, so why
12     don't we take a five-minute break.
13         (Recess taken at 10:35 a.m.)
14         (Back on the record at 10:44 a.m.)
15  BY MR. FIORELLA:
16  Q.  All right, Mr. Haygood, we're back on the record.  You
17     understand you're still under oath?
18  A.  Yes.
19  Q.  Were you responsible for recording employee
20     productivity of any of the employees you supervised at
21     Eaton Aeroquip?
22  A.  I'm not sure if recording is the correct word.  I
23     can't really recall.
24  Q.  Were there ways that you could monitor employee
25     productivity of the employees you supervised at Eaton

Page 57

1     Aeroquip?
2  A.  Yes, there was.
3  Q.  Could you describe those ways for me?
4  A.  I was shown how to take the transactions in MFG Pro,
5      copy, paste them to Excel with the use of pivot
6      tables, and I wasn't strong in Excel, but there was a
7      process -- there was a system there that could help
8      you measure the volume of transactions.  And from
9      there, I could use my own judgment just to determine
10     how things were going.
11  Q.  And did you create those Excel spreadsheets?
12  A.  I wouldn't say create the spreadsheet.  I didn't save
13     them.  I didn't keep them.  I could just copy, paste.
14     If I printed it, I used it for a day and then I
15     disposed of it.  I didn't keep it for a record.
16  Q.  But you did use those -- that tool?
17  A.  I did, yes.
18  Q.  Were there any others?
19  A.  No.
20  Q.  Did you ever do any of the materials movement work
21     yourself?
22  A.  No, I did not.
23  Q.  Why not?
24  A.  That was a union facility.  Generally in the union
25     facilities, supervisors are not allowed to do that

15 (Pages 54 to 57)

Page 122

1    Q.  You were not in Arkansas --
2    A.  No.
3    Q.  -- at the time that you signed this?
4    A.  No, I was not.
5    Q.  Were you in the presence of the notary at the time you
6        signed this?
7    A.  No, I was not.
8    Q.  Was this signature page faxed by you?
9    A.  I had to fax.
10   Q.  Okay.  You can put Haygood Exhibit H2 to the side.
11       Did Mr. Bacon ever contact you while you were an
12       employee of Eaton Aeroquip to discuss this lawsuit?
13   A.  Yes, he did.
14   Q.  Did he do that during working hours?
15   A.  I believe when he and I first talked, it was during my
16       casual time, I would call that.  I arrived early each
17       day, a half hour early, and that's when we discussed
18       it.
19   Q.  Was Mr. Bacon still an employee of Eaton Aeroquip at
20       the time?
21   A.  At the time, yes.
22   Q.  And you were also an employee of Eaton Aeroquip at the
23       time?
24   A.  I had given notice.
25   Q.  Thank you.  After Mr. Bacon left the employ of Eaton

Page 123

1        Aeroquip, did he ever contact you regarding this
2        lawsuit?
3    A.  I left the company before he did.
4    Q.  Are you aware of any attempts by Mr. Bacon to contact
5        the hourly workers at the Jackson plant regarding this
6        lawsuit?
7    A.  I'm not aware of that, no.
8    Q.  Are you aware of any attempts by Mr. Bacon to contact
9        the hourly workers at the Jackson plant regarding his
10       termination from Eaton or his departure from Eaton
11       Aeroquip?
12   A.  I have no knowledge of that.
13   Q.  Did you sign a letter to the U.S. Department of Labor
14       regarding Mr. Bacon's claim that Eaton Aeroquip should
15       have paid Jackson plant supervisors overtime?
16   A.  I believe I did.  There was a -- he showed me a
17       petition, and I do believe I signed it.
18   Q.  Are you aware that the U.S. Department of Labor
19       decided to take no action in response to that letter?
20       MR. SANFORD:  Objection to form.
21   A.  I'm not aware.
22   BY MR. FIORELLA:
23   Q.  Are you aware that the U.S. Department of Labor wrote
24       a letter to Mr. Bacon informing him that the
25       Department of Labor would not take any action with

Page 124

1        regards to his overtime complaint?
2        MR. SANFORD:  Objection to form.
3    A.  I'm not aware.
4    BY MR. FIORELLA:
5    Q.  So you've never seen a letter from the U.S. Department
6        of Labor to Mr. Bacon regarding a complaint about
7        overtime at the Jackson plant?
8    A.  I don't recall seeing such a letter.
9    Q.  Do you have any personal knowledge as we sit here
10       today of any ruling or decision from any government
11       agency, state, federal, any agency, regarding the
12       classification of supervisors at the Jackson plant as
13       exempt from overtime?
14   A.  Just what was described to me by my attorney and what
15       Jeff described, that I should have been classified
16       as a -- where I was not a member of manager -- I
17       wasn't a manager.
18   Q.  Was that based, to your understanding, on any ruling
19       or decision sent to the management at Eaton Aeroquip?
20   A.  Can you ask that one more time.
21       MR. FIORELLA:  Can you read that for me?
22       (The following record was read by the
23       reporter at 12:51 p.m.: "QUESTION:  Was
24       that based, to your understanding, on any
25       ruling or decision sent to the management

Page 125

1        at Eaton Aeroquip?")
2    A.  No, it wasn't based on that, no.
3    BY MR. FIORELLA:
4    Q.  Do you have any personal knowledge of any contact of
5        any type from a government agency to Eaton Aeroquip
6        regarding the classification of supervisors at the
7        Jackson plant as exempt from overtime?
8    A.  Not any personal knowledge, no.
9    Q.  Do you have any personal knowledge of the process by
10       which Eaton Aeroquip decided to classify your position
11       as a supervisor as exempt from overtime?
12   A.  No.
13   Q.  You have no personal knowledge of what steps were
14       taken, if any?
15   A.  No, I do not.
16   Q.  You have no knowledge about what the company
17       considered in making that decision?
18   A.  No, I do not.
19   Q.  Do you have any personal knowledge about any
20       consultants or professionals that the company used in
21       making determinations?
22   A.  No, I do not.
23   Q.  You have no personal knowledge about whether your
24       classification -- your previous classification as
25       being exempt from overtime when you were an employee

Page 126

1   at the Jackson plant has ever been reviewed by anyone
2   at Eaton Aeroquip?
3   A.  I have no knowledge of that, no.
4   Q.  Have you ever read any of the Complaints or part of
5      Complaints in this lawsuit?
6   A.  I've seen some, some of the e-mails that Jeff and Josh
7      have provided.
8   Q.  Were you involved in drafting the Complaint in any
9      way?
10  A.  No.  No, I was not.
11  Q.  The e-mails that you mentioned in your previous
12     answer, did they contain language for the Complaint?
13  A.  I can't recall.
14  Q.  Is there anything you believe that's inaccurate in any
15     of the Complaints?
16  A.  I don't believe so.
17  Q.  Other than in your preparation for your deposition
18     today, have you looked at any documents produced by
19     Eaton Aeroquip in this litigation?
20  A.  No, I have not.
21  Q.  Have you looked at any documents, again, other than in
22     preparation for your deposition today, that were
23     produced by your co-plaintiffs?
24  A.  I can't recall.
25  Q.  What do you understand this lawsuit to be about?

Page 127

1          MR. SANFORD:  Object to the form.
2   BY MR. FIORELLA:
3   Q.  You can answer -- I'm sorry.
4   A.  I'm sorry, I was staring at you.  This lawsuit is
5      about misinterpretation of our job role at Eaton, we
6      had no real authority.  We were not managers in any
7      way, we worked extensive hours and we are due
8      compensation for those hours.
9   Q.  Why did you decide to join this lawsuit?
10  A.  If there's an opportunity that the company owes me
11     compensation, I would like to have that as I described
12     earlier, I've had some hardships in this industry with
13     plant closings, going from plant to plant because of
14     that, so I would like compensation if it's owed to me.
15  Q.  You currently are -- oh, are you currently receiving
16     overtime for your work at Jac Industries?
17  A.  Not anymore, no, I'm not.
18  Q.  Not anymore.  Did you at one time?
19  A.  When I initially went to work for them, they had an
20     overtime compensation financial, but they're in the
21     middle of a -- what they call operation clawback, just
22     to try to help sister plants, and that would help with
23     the overall company's performance, and at a later
24     time, they might reinstall that.
25  Q.  Currently, for example, right now you're not being

Page 128

1      paid overtime?
2   A.  Correct.
3   Q.  Do you think that your current employer has
4      misclassified you as exempt from overtime?
5   A.  No, because I was paid overtime.  They've ceased to do
6      that at this time.  They will compensate in other ways
7      other than financial.  They will do comp days or if
8      you need time, that sort of thing.
9   Q.  So in their -- it sounds like they think paying you,
10     correct me if I'm wrong, but it sounds like they think
11     paying you overtime is optional?
12         MR. SANFORD:  Oh, no, no, no, I will object
13     to the form.
14  A.  Yeah, I have no -- I don't know what their options
15     are.
16  BY MR. FIORELLA:
17  Q.  Have you considered suing your current employer?
18  A.  No, I have not.
19  Q.  Have you talked to any other lawyers besides
20     Mr. Sanford and lawyers affiliated with Mr. Sanford
21     about this lawsuit?
22  A.  No, I have not.
23  Q.  Did you discuss this lawsuit with any current Eaton
24     Aeroquip employees?
25  A.  Other than -- not current, no, just the ones that are

Page 129

1      on this -- on this case.
2   Q.  The plaintiffs that are currently?
3   A.  Right.
4   Q.  Okay.  Have you talked to any former Eaton Aeroquip
5      employees who are not currently plaintiffs about this
6      case?
7   A.  No.
8          MR. FIORELLA:  We'll take the customary
9      two-second break and I think we're done.
10         Thank you very much.  Good luck.
11         THE WITNESS:  Thank you.
12         (Recess taken at 1:00 p.m.)
13         MR. SANFORD:  I would like to order the
14     transcript for the plaintiff in the same way that I
15     did in the previous depositions this week.
16         MR. FIORELLA:  Defendant would also like to
17     order the transcripts in the same way that they have
18     for the previous depositions.
19         (Deposition concluded at 1:00 p.m.
20     Signature of the witness was requested.)
21
22
23
24
25

33 (Pages 126 to 129)

Page 1

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFREY BACON, STEVE HEBB,
NORM HAYGOOD, DENNIS WILSON,
DEREK KYRO, AMRO SAADELDIN,
TIMOTHY BAYNES and MICHELLE DIXON,
Each Individually and on Behalf
of Others Similarly Situated,
        Plaintiffs,
    vs.        Case No. 4:11-CV-14103
            Hon. Gershwin A. Drain

EATON AEROQUIP, LLC,
        Defendant.

_____

The Deposition of STEVEN WAYNE HEBB,
Taken at 2595 Bob McClain Drive NW, Airport Road,
Jackson, Michigan,
Commencing at 8:06 a.m.,
Tuesday, November 6, 2012,
Before Kathryn L. Janes, CSR-3442, RMR, RPR.

Page 2

1  APPEARANCES:
2
3  JOSH SANFORD
4  Sanford Law Firm, PLLC
5  One Financial Center
6  650 South Shackleford, Suite 400
7  Little Rock, Arkansas 72211
8  501.221.0088
9  josh@sanfordlawfirm.com
10     Appearing on behalf of the Plaintiffs.
11
12  ANDREW G. FIORELLA
13  Ulmer & Berne LLP
14  1660 West 2nd Street, Suite 1100
15  Cleveland, Ohio 44113
16  216.583.7154
17  afiorella@ulmer.com
18     Appearing on behalf of the Defendant.
19
20  ALSO PRESENT:
21  Jeffrey Bacon
22
23
24
25

Page 3

1          TABLE OF CONTENTS
2
3  WITNESS                 PAGE
4  STEVEN WAYNE HEBB
5
6  EXAMINATION
7  BY MR. FIORELLA:              6
8
9          EXHIBITS
10
11  EXHIBIT                 PAGE
12  (Exhibits attached to transcript.)
13
14  DEPOSITION EXHIBIT A1      51
15  DEPOSITION EXHIBIT A2      52
16  DEPOSITION EXHIBIT A3      53
17  DEPOSITION EXHIBIT B1      57
18  DEPOSITION EXHIBIT B2      62
19  DEPOSITION EXHIBIT B3      68
20  DEPOSITION EXHIBIT C1      77
21  DEPOSITION EXHIBIT C2      79
22  DEPOSITION EXHIBIT C3      85
23  DEPOSITION EXHIBIT C4      89
24  DEPOSITION EXHIBIT D1      92
25  DEPOSITION EXHIBIT D2      99

Page 4

1  DEPOSITION EXHIBIT D3      105
2  DEPOSITION EXHIBIT D4      110
3  DEPOSITION EXHIBIT D5      113
4  DEPOSITION EXHIBIT D6      119
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  Q.  But you were responsible for filling that out?
2  A.  Yes, I was -- I was basically told to sign it, yeah.
3  Q.  Were there any other reports that you produced on a
4      regular basis, that you recall?
5  A.  Scrap was pretty much daily.  No, I can't remember
6      anything that was really of any significance.
7  Q.  Are you familiar with the term called units per
8      operator day -- a phrase?
9  A.  I think that's what we called UPOD.  If I recall,
10     units -- one unit, I think, would be one hose
11     assembly, so if it was a ten-piece order, we would
12     have ten for the UPOD.  So it was tracked, I think,
13     for each piece that we build.
14 Q.  I imagine, and correct me if I'm wrong, that the
15     number of hose assemblies you could make in a day
16     would vary depending on the complexity of the hose?
17 A.  Yes, sir.
18 Q.  Okay.  Is that information that you tracked?
19 A.  I believe we -- we might have put that into a
20     spreadsheet, and then normally Clint Vigus or Rob
21     would keep tabs on that spreadsheet, and then a lot of
22     times, they would print out a report.  We'd go over it
23     at our meeting.  He'd let us know how we're doing and
24     what else we needed to do to increase the UPOD.
25 Q.  You were responsible for putting in information?

1  A.  Yes, basically put there in the spreadsheet, yeah.
2      Just fill it out.
3  Q.  And how frequently would, approximately, would you do
4      that?
5  A.  Sometimes -- we didn't have to do it on a daily basis,
6      but a lot of times by the end of the week, they
7      preferred that we do it every night so they could
8      review it in the next morning, so I would say pretty
9      much daily basis.
10 Q.  Are you familiar with the phrase first time yield
11     data?
12 A.  Yeah, first time yield, I'm not too familiar with it.
13     I believe the first time would be maybe a new part
14     number that we were building.  So first time yield is
15     basically if you build ten -- I'm not really too
16     familiar with it.
17 Q.  Okay, if you're not, this is not a memory test.
18 A.  Yeah, I don't recall.
19 Q.  Just something you would have worked with in your --
20 A.  I'm familiar with the term, not too familiar with, you
21     know, basically what it means.
22 Q.  So we have the daily scrap report and we have the
23     ideally daily UPOD report?
24 A.  Right.
25 Q.  Are there any other reports that you can recall or

1      information you would gather for about your workers?
2  A.  I know on afternoon shift we didn't really fill out
3      too much paperwork.  A lot of the information, I
4      basically just e-mailed to either Fred or Rob or
5      Clint.
6  Q.  What type of information would you -- you mean, this
7      sort of the scrap report or the UPOD or other
8      information?
9  A.  The UPOD, I think, had its own spreadsheet.  And it
10     just varied, it varied on each individual cell.  If we
11     had a bad night, I'd say we built three orders and it
12     was for only ten pieces, a lot of times they would
13     look at that and say well, how come you only built
14     three orders, but it was due to the complexity of the
15     part numbers that they build.  So each part number
16     might -- one might take you three hours to build,
17     another one might take you 30 minutes, so it just
18     varied.
19 Q.  And that was information when you were on the night
20     shift that you would provide to the supervisors?
21 A.  Yes.
22 Q.  Your supervisors?
23 A.  Either Rob or Clint or Fred.  They would like to know
24     if we had a very bad night in say any one of the
25     cells, a lot of times they would want us to e-mail

1      them and say exactly what happened so they wouldn't
2      have any questions in the morning.
3  Q.  Did you ever do any of the assembly or manufacturing
4      work yourself?
5  A.  We were not allowed to.
6  Q.  Why not?
7  A.  Per the CBA, now, they did have an engineering clause,
8      but that had to be approved by the union before we
9      could ever do anything like that.  The duration of the
10     amount of time I worked there, I was never able to
11     work on any part number whatsoever.
12 Q.  That would include bringing supplies, anything that --
13     I'm sorry, let me make it a better question.
14         Any of the work that the union hourly
15     employees would do, did you ever do any of that work?
16 A.  No, sir.
17 Q.  And that was because of the CBA?
18 A.  Yes.
19 Q.  Now, when we were talking about your experience, your
20     previous employment experience, you had some
21     experience with CBAs it sounded like before you got to
22     the plant?
23 A.  Yes, sir.
24 Q.  Did you, I assume -- well, did you become familiar
25     with the Jackson plant CBA?

Page 136

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFREY BACON, STEVE HEBB,
NORM HAYGOOD, DENNIS WILSON,
DEREK KYRO, AMRO SAADELDIN,
TIMOTHY BAYNES and MICHELLE DIXON,
Each Individually and on Behalf
of Others Similarly Situated,
        Plaintiffs,
   vs.      Case No. 4:11-CV-14103
        Hon. Gershwin A. Drain

EATON AEROQUIP, LLC,
        Defendant.

_____/

The Deposition of STEVEN HEBB - Volume 2,
Taken at 2696 Bob McClain Drive,
Jackson, Michigan,
Commencing at 9:00 a.m.,
Friday, November 30, 2012,
Before Cheri L. Poplin, CSR-5132, RPR, CRR.

Page 137

1  APPEARANCES:
2
3  JOSH SANFORD
4  Sanford Law Firm, PLLC
5  One Financial Center
6  650 South Shackleford, Suite 400
7  Little Rock, Arkansas 72211
8  501.221.0088
9  josh@sanfordlawfirm.com
10   Appearing on behalf of the Plaintiffs.
11
12  ANDREW G. FIORELLA
13  Ulmer Berne, LLP
14  1660 West 2nd Street
15  Suite 1100
16  Cleveland, Ohio 44113
17  216.583.7058
18  afiorella@ulmer.com
19   Appearing on behalf of the Defendant.
20
21  ALSO PRESENT:
22  Jeffrey Bacon
23
24
25

Page 138

1            TABLE OF CONTENTS
2
3  WITNESS             PAGE
4  STEVEN HEBB
5

6  EXAMINATION BY MR. FIORELLA    140
7  EXAMINATION BY MR. SANFORD     232
8
9              EXHIBITS
10
11  EXHIBIT             PAGE
12  (Exhibits attached to transcript.)
13
14  DEPOSITION EXHIBIT B4    142
15  DEPOSITION EXHIBIT B5    145
16  DEPOSITION EXHIBIT B6    147
17  DEPOSITION EXHIBIT D7    150
18  DEPOSITION EXHIBIT D8    150
19  DEPOSITION EXHIBIT D10   155
20  DEPOSITION EXHIBIT D11   155
21  DEPOSITION EXHIBIT D12   162
22  DEPOSITION EXHIBIT D13   163
23  DEPOSITION EXHIBIT D14   167
24  DEPOSITION EXHIBIT D15   174
25  DEPOSITION EXHIBIT D16   175

Page 139

1  DEPOSITION EXHIBIT D17   176
2  DEPOSITION EXHIBIT D18   177
3  DEPOSITION EXHIBIT D19   178
4  DEPOSITION EXHIBIT D20   179
5  DEPOSITION EXHIBIT D21   179
6  DEPOSITION EXHIBIT D22   180
7  DEPOSITION EXHIBIT E1    181
8  DEPOSITION EXHIBIT E2    186
9  DEPOSITION EXHIBIT E3    191
10  DEPOSITION EXHIBIT E4    195
11  DEPOSITION EXHIBIT E5    195
12  DEPOSITION EXHIBIT E6    200
13  DEPOSITION EXHIBIT F1    212
14  DEPOSITION EXHIBIT F2    215
15  DEPOSITION EXHIBIT F3    218
16  DEPOSITION EXHIBIT F4    222
17  DEPOSITION EXHIBIT G1    225
18  DEPOSITION EXHIBIT H1    228
19  DEPOSITION EXHIBIT H2    229
20
21
22
23
24
25

1 (Pages 136 to 139)

Page 204

1   classification without -- you know, that was just
2   common.
3   Q.   So based on the work flow or the needs of the cell or
4        whatever your decision was, you told Dan that he had
5        to work on the Stoddard tester that day?
6   A.   Yeah.  If we had more work there, then basically I'd
7        move him over there based on production needs.
8   Q.   Although this is germane to nothing, I'm curious.  Is
9        there something unpleasant about the Stoddard tester
10       that Dan wouldn't want to work there?
11           MR. SANFORD:  It's got to smell bad; right?
12  A.   It smells bad and it's pretty messy.  You've got to
13       wear gloves.  You can't get it on you.  So it's kind
14       of a caustic fluid, I guess, that they don't like.
15  BY MR. FIORELLA:
16  Q.   Again, germane to nothing, but I just need to know.
17       Okay.  You can put Exhibit E6 to the side.
18           MR. SANFORD:  My first thought was I would
19       grieve if someone moved me to a machine that had a
20       bunch of solvents, because it smells bad.
21  A.   It's pretty nasty solvent.
22           MR. SANFORD:  And my grievance would be
23       denied.
24           MR. FIORELLA:  I know we're short of the
25       hour.  I do have to take a very, very short break here

Page 205

1   and we'll be back in a moment.
2           (Recess taken at 11:20 a.m.)
3           (Back on the record at 11:23 a.m.)
4   BY MR. FIORELLA:
5   Q.   Okay, Mr. Hebb.  We're back on the record.
6   A.   Okay.
7   Q.   You understand you're still under oath?
8   A.   Yes.
9   Q.   Were you a signatory to the letter that Mr. Bacon sent
10       to the U.S. Department of Labor regarding Eaton
11       Aeroquip's policy regarding overtime at the Jackson
12       plant for supervisors?
13  A.   Yes.  I do remember -- yeah.  I do remember signing
14       that.
15           MR. SANFORD:  What was the witness's
16       answer?
17           (The requested portion of the record was
18           read by the reporter at 11:24 a.m.)
19           COURT REPORTER:  Yes.  I do remember --
20       yeah.  I do remember signing that.
21  BY MR. FIORELLA:
22  Q.   Are you aware that the Department of Labor decided to
23       take no action in response to Mr. Bacon's complaint to
24       which you signed?
25           MR. SANFORD:  Object to form.

Page 206

1   A.   Yes.  I -- if I remember, they stated they didn't have
2        the resources to allocate to the complaint.
3   BY MR. FIORELLA:
4   Q.   When did you learn that?
5   A.   It was after -- I learned it from Jeff after they sent
6        it back.  I don't --
7   Q.   Have you seen the letter?
8   A.   No.  Actually I don't remember if Jeff sent it to me,
9        but he did tell me about it.
10  Q.   So what you know about the response from the
11       Department of Labor came from Mr. Bacon?
12  A.   Yes.
13  Q.   Do you have any knowledge regarding any ruling or
14       decision from a government agency regarding the
15       classification of the production supervisors at the
16       Jackson plant as exempt from overtime?
17  A.   State that again.  As far as the --
18  Q.   Sure.
19           MR. FIORELLA:  Could you read it back to
20       him?
21           (The requested portion of the record was
22           read by the reporter at 11:25 a.m.)
23           COURT REPORTER:  Do you have any knowledge
24       regarding any ruling or decision from a government
25       agency regarding the classification of the production

Page 207

1   supervisors at the Jackson plant as exempt from
2   overtime?
3   A.   I don't -- no.  I don't recall any government agency
4        ruling.
5   BY MR. FIORELLA:
6   Q.   Do you have any knowledge about any contact from any
7        government agency to Eaton Aeroquip regarding the
8        classification of the production supervisors at the
9        Jackson plant as exempt from overtime?
10  A.   No.  I'm not familiar with it.
11  Q.   Have you read any of the Complaints in this lawsuit?
12  A.   Just what I've gotten from my attorney and Jeff, yeah.
13  Q.   Were you involved in the drafting of any of the
14       Complaints?
15  A.   No.
16  Q.   Is there anything you believe is inaccurate in any of
17       the Complaints that you've read?
18  A.   Not to my knowledge.  It seems to be fairly accurate,
19       yes.
20  Q.   Other than in preparation for your deposition today,
21       have you looked at any documents produced by Eaton
22       Aeroquip in this lawsuit?
23  A.   Not -- no.  Other than what they presented in front of
24       me here, no.
25  Q.   Why did you join this lawsuit?

18  (Pages 204 to 207)

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


JEFFREY BACON, STEVE HEBB,

NORM HAYGOOD, DENNIS WILSON,

DEREK KYRO, AMRO SAADELDIN,

TIMOTHY BAYNES and MICHELLE DIXON,

Each Individually and on Behalf

of Others Similarly Situated,

               Plaintiffs,

     vs.                  Case No. 4:11-CV-14103

                        Hon. Gershwin A. Drain

EATON AEROQUIP, LLC,

               Defendant.

_____/



      The Deposition of DEREK KYRO,

      Taken at 2696 Bob McClain Drive,

      Jackson, Michigan,

      Commencing at 1:15 p.m.,

      Wednesday, November 28, 2012,

      Before Cheri L. Poplin, CSR-5132, RPR, CRR.

Page 162

1  department would not take any action on Mr. Bacon's
2  overtime complaint?
3         MR. SANFORD:  Object to the form.
4  A.  No.
5  BY MS. BOXER:
6  Q.  Do you have any knowledge of any ruling or decision
7     from a government agency regarding the classification
8     of supervisors at the Jackson plant?
9  A.  No.
10 Q.  Do you have any knowledge of any ruling or decision
11    from a government agency regarding classification of
12    production supervisors at the Jackson plant?
13 A.  No.
14 Q.  How about of logistics supervisors like you at the
15    Jackson plant?
16 A.  No.
17 Q.  Do you have any personal knowledge of how your
18    classification was determined at the Jackson plant?
19 A.  No.
20 Q.  Do you have any personal knowledge of how your
21    classification was determined by Eaton Aeroquip?
22 A.  No.
23 Q.  Do you have any personal knowledge of what was done by
24    management at the Jackson plant to review your
25    classification?

Page 163

1  A.  No.
2  Q.  Do you have any knowledge of what management at the
3     Jackson plant did to review the classification once
4     Mr. Bacon complained about the classification?
5  A.  No.
6  Q.  And do you have any personal knowledge of what Eaton
7     Aeroquip or Eaton did to determine or review your
8     classification as exempt under the Fair Labor Standard
9     Act?
10 A.  No.
11 Q.  Have you read any of the Complaints in this lawsuit?
12 A.  Just -- no.
13 Q.  You've not read any Complaints?
14 A.  I've read the ones that were given to me by my
15    attorney.
16 Q.  Were you involved in drafting of the Complaint?
17 A.  No.
18 Q.  Did you discuss what was in any of the Complaints with
19    your lawyers before it was filed?
20 A.  No.
21 Q.  Have you looked at any documents in preparation for
22    your deposition?
23 A.  Yes.
24 Q.  What documents have you looked at?
25 A.  There were some transfer orders, some grievances.

Page 164

1  Q.  Anything else?
2  A.  Not that I remember.
3         (Discussion off the record at 6:03 p.m.)
4         (Back on the record at 6:03 p.m.)
5  BY MS. BOXER:
6  Q.  Is there anything else that you did to prepare for
7     your deposition today?
8  A.  No.
9  Q.  Did you talk to any of the plaintiffs outside the
10    purview of your lawyer?
11 A.  No.
12 Q.  Have you contacted anyone about joining the lawsuit?
13 A.  No.
14 Q.  How did you come to join the lawsuit?
15 A.  Jeff Bacon contacted me.
16 Q.  When did he contact you?
17 A.  I don't know the exact dates.
18 Q.  Were you employed by Eaton Aeroquip at the time?
19 A.  No.
20 Q.  How did he know where to contact you?
21 A.  I do not know.  Cell phone.  I don't know if he had my
22    number or not from when we worked together.
23 Q.  How did you come to hire your lawyer?
24 A.  That was through Jeff.
25 Q.  Do you know why you hired a lawyer from Arkansas

Page 165

1  rather than Michigan?
2  A.  I do not.
3  Q.  Have you talked to any Michigan lawyers about your
4     claims?
5  A.  I have not.
6  Q.  Have you talked to anyone other than your lawyers
7     about this lawsuit?
8  A.  No.
9  Q.  When Mr. Bacon contacted you to join the lawsuit, what
10    did he tell you?
11 A.  He said we were misclassified as supervisors and that
12    there would be an opportunity to get our overtime paid
13    for.
14 Q.  Anything else?
15 A.  No.
16 Q.  Have you talked to any other plaintiffs?
17 A.  Just when I saw him here.
18 Q.  Were you asked by your attorneys to collect documents
19    related to your employment with Eaton Aeroquip?
20 A.  No.
21 Q.  You were not asked to collect any documents?
22 A.  Not to my knowledge.
23 Q.  Did you turn over any documents to your attorneys
24    related to your employment at Eaton Aeroquip?
25 A.  Only my resume and then the inter -- whatever you call

42  (Pages 162 to 165)

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


JEFFREY BACON, STEVE HEBB,

NORM HAYGOOD, DENNIS WILSON,

DEREK KYRO, AMRO SAADELDIN,

TIMOTHY BAYNES and MICHELLE DIXON,

Each Individually and on Behalf

of Others Similarly Situated,

               Plaintiffs,

        vs.             Case No. 4:11-CV-14103

                         Hon. Gershwin A. Drain

EATON AEROQUIP, LLC,

               Defendant.

_____


      The Deposition of AMRO SAADELDIN,

      Taken at 2595 Bob McClain Drive NW, Airport Road,

      Jackson, Michigan,

      Commencing at 2:06 p.m.,

      Thursday, November 8, 2012,

      Before Kathryn L. Janes, CSR-3442, RMR, RPR.

Page 62

1  A.  Because my computer at home was not working.  I have
2     to say the truth, right?
3  Q.  Yes, you do.  Did you ever do any of the manufacturing
4     work yourself?
5  A.  No.  We were not allowed by CBA.  As a matter of fact,
6     I had the steward one time threaten me for he was
7     going to write a grievance against me because I moved
8     the cart that have work on it from A to Z, and 5,
9     6 feet.
10 Q.  And were you not permitted to do that under the
11    Collective Bargaining Agreement?
12 A.  Correct.
13 Q.  Because that was considered hourly employee work?
14 A.  Yes.
15 Q.  Did you ever do any other work of the hourly employees
16    other than move the cart?
17 A.  No.  I learned my lesson.
18 Q.  What was that?
19 A.  I learned my lesson.
20 Q.  Did you have a supervisor?
21 A.  I had Fred Shaffer is my supervisor.  Then when I
22    moved first shift it was Clint Vigus.
23 Q.  And just to be clear, you returned to first shift or
24    you were assigned to first shift on or about May 18,
25    2009; does that sound right?

Page 63

1  A.  Yes.  And also to be clear, when I returned, it was
2     John McKay is the production manager that become Clint
3     Vigus later on, when John retired, I believe.
4  Q.  Whether it was Fred Shaffer or John McKay or Clint
5     Vigus, did they visit your department?
6  A.  They did.
7  Q.  How often?
8  A.  Fred used to take a lot of walks in the area, so every
9     time he come to my department, we stand and talk for
10    five, ten minutes.  John probably once every day,
11    every two days, same with Clint.
12 Q.  How long would any of them stay?
13 A.  As I said, five, ten minutes, maybe twice a day, maybe
14    once a day.  It depends.
15 Q.  And they would talk to you?
16 A.  Would talk to me or they would talk to the employee,
17    unless the employee page them and he want to talk to
18    them alone or separate away from me.
19 Q.  Did Clint directly instruct your employees in your
20    department?
21 A.  Sometimes.
22 Q.  How often?
23 A.  I don't have exact number, but sometimes instruct them
24    about, you know, moving the employee from one location
25    to another, doing the transfer slip or helping another

Page 64

1     supervisor to do it if I'm not on the floor at the
2     moment.
3  Q.  So was he talking to the employee or was he talking to
4     you?
5  A.  Talking to employee.  Some jobs that like, as I said,
6     hot jobs, priority of 9 or 10, or aircraft on ground
7     that sometimes Clint used to take the steps by asking
8     the employee hey, let's get the job out.
9  Q.  And again, you don't recall how often?
10 A.  I can't give you exact number.
11 Q.  Once a week?
12 A.  Maybe.
13 Q.  Once a month?
14 A.  No, it's more than once a month.
15 Q.  So somewhere between once a week and once a month?
16 A.  Yes.
17 Q.  Did anyone from HR visit your department?
18 A.  No.  Not unless they get page by the employee.  I
19    mean, I have heard my employee paging Kim DeForest,
20    then Kim end up calling the number that got paged and
21    they have this conversation that I'm not aware about.
22 Q.  How often would one of your employees page Kim
23    DeForest?
24 A.  Once a month, twice a month, it happened.
25 Q.  Did Kim walk onto the floor?

Page 65

1  A.  I mean, I see her once maybe coming to one of my
2     employee, talking to him.  I had three stewards or
3     maybe two reported to me, so a lot of time in a
4     grievance or any write-up or something, they need to
5     talk to Kim about it, and sometime -- a lot of time
6     they page her, they talk to her over the phone.  Then
7     when I go and observe them, who you talking to, I'm
8     talking to Kim, so I have to stay back.  HR on the
9     phone with the employee.
10 Q.  Right, but did Kim walk onto the floor?
11 A.  Probably once or twice.
12 Q.  The entire time that you worked on first shift?
13 A.  No, maybe more than that the entire time.  Five, six
14    times during the year.
15 Q.  Anyone else visit your department from HR?
16 A.  No.
17 Q.  While you were at Eaton Aeroquip, did you ever take
18    any company sponsored training?
19 A.  I have took some training, it's just like the other
20    supervisors, we took Flight 101, it was a full day
21    training, took some classes online.
22 Q.  What was Flight 101?
23 A.  It was about customer satisfaction, it was a full-day
24    training that everybody in the plant went through it.
25 Q.  The hourly employees?

17 (Pages 62 to 65)

Page 150

1    decided to take no action in response to Mr. Bacon's
2    complaint?
3          MR. SANFORD:  Object to the form.
4    A.  Yes, I am.
5    BY MS. BOXER:
6    Q.  Are you aware that the U.S. Department of Labor wrote
7        a letter to Mr. Bacon informing him that the
8        department would not take any action on the overtime
9        complaint?
10         MR. SANFORD:  Object to form.
11   A.  Yes.
12   BY MS. BOXER:
13   Q.  Have you ever seen the letter?
14   A.  No.
15   Q.  How are you aware of both of these facts?
16   A.  Mr. Bacon told me about it.
17   Q.  When did he tell you?
18   A.  On the phone, what day, I can't really exactly
19       remember.
20   Q.  Was it this past week?
21   A.  No, before that.
22   Q.  The last ten days?
23   A.  Probably last month.
24   Q.  Do you know that the letter was sent in July of
25       2011 -- June or July of 2011?

Page 151

1    A.  I don't know the date.
2    Q.  Do you have any knowledge of any decision or ruling --
3        strike that.
4          Do you have any knowledge of any ruling or
5        decision from a government agency regarding the
6        classification of production supervisors at the
7        Jackson plant as exempt?
8    A.  No, I don't.
9    Q.  Do you have any personal knowledge of how your
10       classification was determined at the Jackson plant?
11   A.  No.
12   Q.  Do you have any personal knowledge of how your
13       classification was determined by Eaton Aeroquip?
14   A.  No.
15   Q.  Do you have any personal knowledge of what was done by
16       management at the Jackson plant to review the
17       classification?
18   A.  No.
19   Q.  Do you have any knowledge of what management of the
20       Jackson plant did to review the classification once
21       Bacon complained about the classification?
22   A.  No.
23   Q.  Do you have any personal knowledge of what Eaton
24       Aeroquip or Eaton did in relation to the determination
25       or review of your classification?

Page 152

1    A.  No.
2    Q.  Have you read the Complaints or Complaint in this
3        lawsuit?
4    A.  I did.
5    Q.  Were you involved in drafting any of the Complaints?
6    A.  No.
7    Q.  Did you discuss what was in any of your Complaints
8        with your lawyers before it was filed?
9    A.  Yes.
10   Q.  Is there anything that you believe is inaccurate in
11       the Complaint that you read?
12   A.  No.
13   Q.  Have you looked at any documents in preparation for
14       your deposition?
15   A.  Can you repeat the question?
16         (The following record was read by the
17          reporter at 6:49 p.m.:  "QUESTION:  Have
18          you looked at any documents in preparation
19          for your deposition?")
20   A.  Yes.
21   BY MS. BOXER:
22   Q.  What documents did you look at?
23   A.  The document that I -- the file that we sent, the
24       Complaint, I just went through it real quick.
25   Q.  The file that you sent, the Complaint, what are you

Page 153

1    talking about?
2    A.  The Complaint, the e-mail that I got from Josh for the
3        paperwork that we sent for the Complaint, I just went
4        through it, I read it, kind of refreshed my memory.
5    Q.  So you reviewed a copy of the Complaint that was filed
6        with the court?
7    A.  I reviewed a copy that I have in my mailbox from my
8        attorney, I think it's the Complaint, yes.
9    Q.  Anything else?
10   A.  No.
11   Q.  What do you understand this lawsuit to be about?
12   A.  It's about supervisors working overtime and not
13       getting paid.  It's about double standard from Eaton
14       as far as Eaton policy, if they have facility that
15       they pay overtime for supervisor for Jackson plant.
16   Q.  Double standard, what do you mean?
17   A.  There is other facilities that is managed or owned by
18       Eaton that the supervisor work overtime and they get
19       paid for the working overtime.
20   Q.  Do you know what facility?
21   A.  Yes, the facility I used to work for.
22   Q.  Which facility is that?
23   A.  It used to be GT Product and it become Eaton when
24       Eaton bought it in 1998, when we said this earlier.
25   Q.  Okay.  And that facility, production supervisors were

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


JEFFREY BACON, STEVE HEBB,

NORM HAYGOOD, DENNIS WILSON,

DEREK KYRO, AMRO SAADELDIN,

TIMOTHY BAYNES and MICHELLE DIXON,

Each Individually and on Behalf

of Others Similarly Situated,

                Plaintiffs,

       vs.             Case No. 4:11-CV-14103

                       Hon. Gershwin A. Drain

EATON AEROQUIP, LLC,

                Defendant.

_____


      The Deposition of DENNIS LEE WILSON,

      Taken at 2595 Bob McClain Drive NW, Airport Road,

      Jackson, Michigan,

      Commencing at 8:57 a.m.,

      Monday, November 5, 2012,

      Before Kathryn L. Janes, CSR-3442, RMR, RPR.

Page 42

1    A.  Correct.
2    Q.  I see.  Were you responsible for tracking on-time
3        delivery of work?
4    A.  No.
5    Q.  Are you familiar with the term called quality through
6        scrap?
7    A.  No.
8    Q.  Did you have a labor budget for your -- the people you
9        supervised?
10   A.  No.
11   Q.  Did you ever do any of the, say, for example, the cart
12       pulling work yourself?
13   A.  No.
14   Q.  Any of the -- did you yourself ever do any of the work
15       in any of the stock rooms?
16   A.  No.
17   Q.  Did you ever do any of the work of the material
18       movers?
19   A.  No.
20   Q.  Why not?  For -- let's start with the kind of an open
21       ended question, let's say why did you -- why have you
22       never done any of the cart work?
23   A.  It's a union plant.  CBA requires that the union
24       employees do the work.
25   Q.  That would be in all the areas that we --

Page 43

1    A.  All the areas.  Now, they can arrange for the
2        engineers to come down and work on the machinery and
3        whatnot for evaluation of new procedures.  I never saw
4        any of that type of a process done for the type of
5        work I did.  It has to be done prior.  The CBA is
6        pretty clear on that, so the supervisors cannot have a
7        hands-on action.
8    Q.  It sounds like you're reasonably familiar with, but
9        let me ask you straight up.  Did you become familiar
10       with the Jackson plant CBA during your time at Eaton
11       Aeroquip?
12   A.  Fairly familiar, yes.
13   Q.  Did you consider the CBA to be binding on your actions
14       as a supervisor at the Jackson plant?
15   A.  Yes.
16   Q.  Do you recall -- and I mean, in the broadest or most
17       specific terms that you feel comfortable testifying,
18       do you recall what sort of things the CBA governed?
19           MR. SANFORD:  Object to the form.
20   A.  CBA covered the operation of the plant in its broadest
21       terms, how we dealt with disciplinary actions, how we
22       dealt with temporary transfers, the bid process.  It
23       was all inclusive.
24   BY MR. FIORELLA:
25   Q.  This isn't -- none of, nothing today is a memory test

Page 44

1        or a quiz show, just what you recall.  You do recall
2        the CBA having procedures about discipline of the
3        employees?
4    A.  Yes.
5    Q.  You mentioned something about temporary employees?
6    A.  No, temporary transfers.
7    Q.  Ah, temporary transfers.  What did you mean by
8        temporary transfers specifically with respect to the
9        CBA?
10   A.  Temporary transfer is where I would take or a
11       supervisor would take a qualified individual and
12       transfer them to a different job for a short period of
13       time.
14   Q.  And you did -- I know you both said I and then you
15       went more -- more specifically, but did you ever --
16       did you ever transfer any employees pursuant to the
17       procedures in the CBA?
18   A.  Yes.
19   Q.  We'll look at some of the documents specifically
20       later, but I want to get sort of the broad overview --
21   A.  Uh-huh.
22   Q.  -- so we know what we're all talking about here.  You
23       mentioned a bid process; do you recall that?
24   A.  I recall mentioning it.
25   Q.  Yeah, do you know what that is?

Page 45

1    A.  I do not recall exactly what's in the CBA about it,
2        because we had no input on it.
3    Q.  Understood, but that is something you recall from the
4        CBA?
5    A.  It's contained within.
6    Q.  Got it.  In your opinion, was the Jackson plant
7        management also governed by the terms of the CBA as
8        far as what they could and couldn't do with the
9        workers?
10   A.  Yes.
11           MR. FIORELLA:  Well, we've gone for about
12       an hour.  I'm got -- we're about to go into some
13       exhibits, so I think now is probably a good time to
14       take a break.
15           (Recess taken at 9:58 a.m.)
16           (Back on the record at 10:11 a.m.)
17   BY MR. FIORELLA:
18   Q.  Welcome back, Mr. Wilson, you understand that you're
19       still under oath?
20   A.  Yes.
21   Q.  Okay.
22           MARKED FOR IDENTIFICATION:
23           DEPOSITION EXHIBIT A2
24           10:12 a.m.
25   BY MR. FIORELLA:

Page 166

1   BY MR. FIORELLA:
2   Q.  Do you have any knowledge, as you sit here today, of
3       any contact of any type from a government agency
4       regarding the classification of supervisors in the
5       Jackson plant as exempt from overtime?
6   A.  No.
7   Q.  As you sit here today, do you have any information
8       that Eaton Aeroquip or any of its agents failed to
9       review the Fair Labor Standard Acts or the regulations
10      of government agencies regarding the exemption from
11      overtime of supervisors at the Jackson plant?
12          MR. SANFORD: Object to the form.
13  A.  No.
14  BY MR. FIORELLA:
15  Q.  Do you -- I'm sorry, have you read any of the
16      Complaints in this lawsuit?
17  A.  I have read part of them, yes.
18  Q.  Were you involved in drafting any of the Complaints?
19  A.  No.
20  Q.  Did you discuss what was in any of the Complaints with
21      your lawyer or lawyers before the Complaints were
22      filed?
23  A.  No.
24  Q.  Just as a general standing matter, when I ask you
25      these questions, I definitely do not want you to tell

Page 167

1   me anything that you discussed with Mr. Sanford or any
2   of his associates or any of the local counsel or any
3   of them. Based on your review of a portion of the
4   Complaints in this matter, do you believe there's
5   anything inaccurate in any of the Complaints?
6   A.  Not that I know of, no.
7   Q.  Other than in preparation for your deposition today,
8       have you looked at any documents produced by Eaton
9       Aeroquip in this case?
10  A.  No.
11  Q.  How did you learn that Mr. Bacon had first brought
12      this lawsuit? Let me ask a better foundational
13      question. Your name, did your name appear on the
14      first Complaint that was filed in this matter?
15  A.  I don't believe so, no.
16  Q.  So I'll now ask the question I asked before. How did
17      you learn that Mr. Bacon had brought this lawsuit?
18  A.  I guess I don't remember just how I did know, word --
19      word of mouth from somebody somewhere.
20          MR. SANFORD: Of course, I'm going to
21      object to the extent that he contacted us and gained
22      information about it, and I know you're not asking
23      that, but I just want to make sure that that is out
24      there.
25          MR. FIORELLA: I appreciate that. And this

Page 168

1   is that part of the deposition that always gets into
2   those areas.
3       MR. SANFORD: Yeah.
4   BY MR. FIORELLA:
5   Q.  Do you know approximately when you decided to join in
6       this lawsuit?
7   A.  The end of 2011.
8   Q.  Without reviewing anything you may have learned from
9       counsel or any conversations you had with counsel, can
10      you tell me why you decided to join this lawsuit?
11  A.  I felt that the matter in which -- in which the
12      supervisors were being treated at the East Avenue
13      plant was unfair and excessive and needed to be
14      changed.
15  Q.  I think you answered this before, but let's be clear.
16      The Department of Labor's decision about Mr. Bacon's
17      complaint, you learned about that after you decided to
18      join the lawsuit?
19          MR. SANFORD: Object to the form.
20  A.  I believe it was after.
21  BY MR. FIORELLA:
22  Q.  Have you talked to anyone other than your lawyers
23      about this lawsuit?
24  A.  No.
25  Q.  So you didn't discuss this lawsuit with any current

Page 169

1   Eaton Aeroquip employees?
2   A.  No.
3   Q.  Did you discuss this lawsuit with any former Eaton
4       Aeroquip employees?
5   A.  No.
6   Q.  Did you meet with anyone, talk with anyone in
7       preparation for your deposition?
8           MR. SANFORD: He means other than when you
9       met with your attorneys.
10  A.  No.
11  BY MR. FIORELLA:
12  Q.  Either with or without your attorneys, did you review
13      any documents in preparation for your deposition?
14  A.  Yes.
15  Q.  Were the documents selected by your attorney?
16  A.  They were documents that were forwarded to him from
17      Eaton.
18  Q.  That should end all the sensitive stuff. Well, maybe
19      not, there's a couple more.
20          MR. SANFORD: Is your attorney a jerk.
21          MR. FIORELLA: No, no, I know you too well
22      to ask that question.
23  BY MR. FIORELLA:
24  Q.  At any point in time were you asked by your attorneys
25      to collect documents related to your employment with